J-A23004-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LAUREN MOHAR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DONALD SHAWVER | : | No. 471 MDA 2023 |
| v. | : | |
| | : | |
| | : | |
| DENISE WOOD AND KELLER | : | |
| WILLIAMS ADVANTAGE REALTY | : | |
| v. | : | |
| | : | |
| | : | |
| KISSINGER BIGATEL AND BROWER, | : | |
| INC. D/B/A KISSINGER BIGATEL | : | |
| AND BROWER REALTORS AND | : | |
| SARAH SCHROEDER A/K/A SARAH | : | |
| BOHA | | |

Appeal from the Judgment Entered March 6, 2023
In the Court of Common Pleas of Centre County Civil Division at No(s):
20-1312

BEFORE:   LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:              **FILED: MARCH 21, 2024**

Lauren Mohar appeals from the judgment, entered in the Court of

Common Pleas of Centre County, granting summary judgment in favor of

Appellees, Donald Shawver, Denise Wood, Keller Williams Advantage Realty,

Kissinger Bigatel and Brower, Inc., d/b/a Kissinger Bigatel and Brower

---

[*] Former Justice specially assigned to the Superior Court.

Realtors (KBB), and Sarah Schroeder a/k/a Sarah Boha (Schroeder), (collectively, Appellees). Upon careful review, we affirm.

Mohar originally brought this slip and fall action sounding in negligence against Shawver based on injuries she allegedly sustained when attending a house showing at Shawver's residence located at 118 Mack Avenue, Pleasant Gap, Centre County (Property) on October 23, 2019. The trial court set forth the facts of this case more particularly as follows:

> [On October 23, 2019, a]t the time of the slip and fall incident giving rise to this case, [] Shawver owned [the Property]. In July of 2019, Shawver entered a contract with [] Schroeder, a real estate agent affiliated with KBB, to list the Property for sale. As of that time, Shawver and his wife had already moved to another residence, and the Property was unoccupied.
>
> [At that time, Mohar] was working with [] Wood, a real estate agent affiliated with Keller Williams, while looking for a residential property[. Mohar] had previously been to an open house at the Property, and she contacted Wood to schedule a time to see the Property again. Wood had not attended the open house with [Mohar]. Wood scheduled the [October 23, 2019] appointment through . . . Schroeder at KBB.
>
> [Mohar] and Wood traveled to the Property together on October 23, 2019, the date of the scheduled showing. Schroeder did not attend. [Mohar] and Wood were the only people at the Property at th[at] time[].
>
> When [Mohar] previously visited the Property for the open house, she had not gone out to the backyard. During the October 23, 2019 showing, [Mohar] and Wood went out to see the backyard. When they exited the house, Wood turned in one direction, and [Mohar] went in another, heading through the yard toward a shed on the Property. Intending to look at the shed, [Mohar] walked up a short wooden ramp leading to the shed door. She found the door locked and turned around to walk back down. As she turned to head down the ramp, [Mohar] fell. She testified she had not even fully turned around when the fall occurred. She landed partially under a bush on the side of the ramp and shed. Wood

- 2 -

heard [Mohar] yell and upon finding her rendered assistance. Wood did not see [Mohar] fall.

[Mohar]'s observations of the ramp on the day of the incident were somewhat limited. In her deposition testimony, [Mohar] described the ramp as "very short" and "covered in leaves." [Mohar] acknowledged that she could tell the leaves were damp, and that it had rained either that morning or the night before. [Mohar] was not concerned about the leaves on the surface as she walked up the ramp. [Mohar] testified that it was when she turned to walk back down the ramp that she fell. **When asked what caused her fall, [Mohar] responded that she could not answer because it happened so fast.** [Mohar] was asked to further describe her complaint allegation that a "slippery condition" existed and caused her to fall. [Mohar] responded that there were leaves on the ramp, and that, when she went back a day later to see what had caused her fall[,] she observed some brown and green colored items on the ramp and thought she could see where she had slid on it, but she could not be certain. [Mohar] and her friend observed the backyard and ramp the day after the incident from a neighboring [p]roperty. They took a photograph that day.

Wood was deposed in discovery. She testified she did not make any observation about the ramp on the day of the incident. She was focused on [Mohar]'s well-being and getting her the help she needed after she fell. Another agent associated with Keller Williams, Nyssa Smith [], appeared at the Property very shortly after the incident to show the Property to a client. Wood was still there when Smith arrived, and Smith was told that an accident had just occurred at the ramp to the shed. Smith and her clients nonetheless went to look at the shed. Smith described that the ramp looked "sketchy or precarious." Smith also recalled that the ramp had looked "dangerous," but she was not able to say why or give any factual description as to what she had observed. She testified that she remembered thinking about algae and that[,] when there is algae present on a deck and the deck is greenish in color[,] it can be slippery; she thought there was potentially algae on the ramp. Smith could not recall whether there were leaves on the ramp. She could not recall whether or not she and her clients [] went into the shed or walked on the ramp that day.

Trial Court Opinion, 3/6/23, at 3-5 (citations and footnotes omitted; emphasis added).

Mohar filed a complaint against Shawver seeking damages for the injuries she allegedly sustained while at the Property. Shawver joined Wood and Keller Williams, who in turn joined Schroeder and KBB. Each of the defendants filed crossclaims against the others.

The Court issued an order on July 19, 2022, requiring any motions for summary judgment and supporting briefs be filed by August 30, 2022. Appellees then timely filed a motion for summary judgment, arguing that Mohar failed to provide sufficient evidence on the issue of causation to meet her *prima facie* trial burden. All parties submitted briefs and reply briefs in support of their respective positions. On March 6, 2023, the trial court granted Appellees' motion for summary judgment, finding that Mohar failed to establish causation.[1] Mohar filed a timely appeal; Mohar and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Mohar raises the following issues for our review:

1. Whether the trial court erred as a matter of law in granting [Appellees'] motions for summary judgment when the record before it established a genuine issue of material fact regarding the causal connection between [Appellees'] negligence and [Mohar's] injuries?

2. Whether the trial court erred as a matter of law in failing to review the record in the light most favorable to [Mohar] as the non-moving party and failing to resolve all doubts as to the existence of a genuine issue of material fact regarding the causal connection between [Appellees'] negligence and [Mohar's] injuries?

---

[1] The court's order was a final order disposing of all claims by all parties. ***See*** Pa.R.A.P. 341(a).

Appellant's Brief, at 2.

The appellate standard of review from the grant of a motion for summary judgment is well-settled:

> The Pennsylvania Rules of Civil Procedure allow disposition of a case on summary judgment only where the record demonstrates an absence of factual questions material to the elements of the disputed causes of action. We have held accordingly that:
>
>> A proper grant of summary judgment depends upon an evidentiary record that either[:] (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a *prima facie* cause of action or defense. Under [Pennsylvania Rule of Civil Procedure] 1035.2(2), if a defendant is the moving party, [the defendant] may make the showing necessary to support the entrance of summary judgment by pointing to materials which indicate that the plaintiff is unable to satisfy an element of [the plaintiff's] cause of action. Correspondingly, the non-moving party must adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict favorable to the non-moving party.
>
> Thus, a plaintiff's failure to adduce evidence to substantiate any element of [the plaintiff's] cause of action entitles the defendant to summary judgment as a matter of law. As with all questions of law, our scope of review of a trial court's order granting summary judgment is plenary. Our standard of review is the same as that of the trial court; we must review the record in the light most favorable to the non-moving party granting [her] the benefit of all reasonable inferences and resolving all doubts in [her] favor. We will reverse the court's order only where the appellant . . . demonstrates that the court abused its discretion or committed legal error.

***Fisher v. J.A. Sexauer***, 53 A.3d 771, 774-75 (Pa. Super. 2012) (citations, quotation marks, and brackets omitted).

When deciding a motion for summary judgment, the record is explicitly limited and consists of the pleadings, depositions, admissions, responses to interrogatories, affidavits, and reports signed by expert witnesses that comply with the rules of discovery. *Finder v. Crawford*, 167 A.3d 40, 44 (Pa. Super. 2017) (citation omitted).

"In order to establish a claim of negligence the plaintiff has the burden of proving four elements: 1) a duty or obligation recognized by law; 2) a breach of that duty; 3) a causal connection between the conduct and the resulting injury; and 4) actual damages." *Kelly v. St. Mary Hosp.*, 778 A.2d 1224, 1226 (Pa. Super. 2001). Further, in a slip and fall negligence action, the plaintiff must prove that the defendant had actual or constructive notice of the dangerous or unsafe condition which caused the injury. *See Loeb v. Allegheny County*, 147 A.2d 336, 338 (Pa. 1959); *see also Estate of Swift by Swift v. Northeastern Hosp.*, 690 A.2d 719, 723 (Pa. Super. 1997) ("An invitee must prove either the proprietor of the land had a hand in creating the harmful condition, or [] had actual or constructive notice of such condition.") (citation omitted).

Regarding a plaintiff's burden in establishing the element of causation of a negligence claim, our Supreme Court has stated that:

> It is hornbook law that . . . [t]he mere happening of an accident is no evidence of negligence. Plaintiff has the two-fold burden of proving that the defendant was negligent and that his negligence was the proximate cause of the accident[.] A jury is not permitted[] to speculate or guess; conjecture, guess[,] or suspicion do not amount to proof[.] Plaintiff ha[s] the burden of

- 6 -

proving a defect or unsafe condition and that defendant had actual or constructive notice thereof.

*Freund v. Hyman*, 103 A.2d 658, 659 (Pa. 1954) (citations and ellipses omitted); *see also Smith v. Bell Tel. Co.*, 153 A.2d 477, 479-80 (Pa. 1959) ("[T]he jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but [] there must be evidence upon which logically its conclusion may be based.").

It is well-settled that negligence is not established unless shown to be "a causative factor" of the injury. *Freund*, 103 A.2d at 659; *see also Harrison v. Pittsburgh*, 44 A.2d 273, 274 (Pa. 1945) (same). However, "it is not necessary that plaintiff prove with mathematical exactness that the accident could only have been caused in one manner to the exclusion of all other possibilities but [s]he must eliminate those other causes, if any, as were fairly suggested by the evidence." *Cuthbert v. Philadelphia*, 209 A.2d 261, 263-64 (Pa. 1965) (citations omitted). Additionally, "[w]here a defendant is liable for only one of two or more equally probable causes and to say which is a mere guess, there can be no recovery[.]" *Houston v. Republican Athletic Ass'n*, 22 A.2d 715, 716 (Pa. 1941).

Further, when a party who has the burden of proof relies upon circumstantial evidence, such evidence must be adequate and "so preponderate in favor of [the] conclusion sought as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith." *Smith*, 153 A.2d at 480.

Here, Mohar first relies upon her own deposition testimony in arguing she met her *prima facie* burden for establishing causation. Specifically, Mohar testified as follows:

Q. Did you and [Wood] discuss the shed?

A. We did not.

Q. Whenever you went to the shed, you were alone, by yourself, in a sense that [Wood] wasn't beside you?

A. Correct.

Q. Describe for me what happened in terms of your approaching or attempting to enter the shed.

A. When I walked up to the shed, like I said, I went to see if it was unlocked so I could see what the inside looked like. It was a very short ramp up to the entrance to the shed. It was covered in leaves, but I didn't feel—I wasn't concerned about walking on those. I got to the door. It was locked, so I turned around to go back down. That was the last thing because when I turned, that's when I fell.

Q. Was it sort of a slippery sensation? **What caused the fall?**

A. **It happened so fast. I was standing and then I wasn't. I can't answer that.**

Q. In your [c]omplaint that's filed in this action **you are pretty specific that you fell as a result of a slippery condition, correct?**

A. **Yes.**

Q. **What would that slippery condition have been comprised of?**

A. Like I said, **there were leaves on it.** I had on normal shoes. I wasn't as concerned with that. When I went back later to look at that to see what did make me fall, **there were some brown and green colored items**. I could see where I slid in the pictures that I took on the ramp and you could see—**it's like a mossy type thing underneath the leaves, what I would assume would grow on wood.**

Q. Were you looking where you were walking whenever you first approached before falling?

A. Yes, absolutely.

Q. According to your [c]omplaint, there was a slippery condition that was comprised of leaves. I assume wet or damp leaves on the ramp?

A. Correct.

Q. And since you were looking where you were going, this condition would have been visible, correct?

A. Well, you could tell the leaves were damp. I couldn't tell what was under the leaves.

Q. Leaves are objects that are visible, correct?

A. Yes.

Q. And you knew that you were going up a short ramp, a wooden ramp?

A. Yes.

Q. And to the extent that the wooden ramp would have been visible, even if leaves were present, you would have been aware that it was a wooden ramp itself?

A. I don't know if it was—I didn't know at the time whether it was a wooden ramp or not. I don't know that I paid attention to that.

Q. Did you—you mentioned that you had your fall and you would have reinspected or looked at the condition. How did that come about? Were you on the ground after you had fallen?

A. When I fell, I just laid on the ground. I actually went back the next day. One of my friends took me back, and we went through the credit union's parking lot. We didn't go on the [P]roperty. []

Deposition of Lauren Mohar, 11/23/21, at 12-15 (emphasis added). Mohar

further testified regarding her fall and the cause thereof as follows:

Q. Whenever you fell, if you recall, did your weight go down on the ankle? Was it a twisting or torsion? Did you hear a crack? What were the forensic details of the fall, if you can describe that?

A. I did not hear it crack. Of course, you're hoping afterwards—I'm convincing myself it was just sprained and not broken but I never had a broken bone before so I didn't know. **It just happened so fast. I can't picture where my ankle was in relationship to my body.**

Q. When your fall occurred, and correct me if I'm wrong, was it as you approached the door and then were turning away from the door to go back down the ramp?

A. Yes. When I realized the door was locked and I couldn't enter the shed, I turned to go back down, and it happened as I was turning. I didn't get fully turned around.

. . .

Q. You mentioned that you were looking where you were walking. I'm assuming you were looking at the surface you were going to walk on or across. Did you have any reservations or concerns relative to the leaves or dampness of the ramp itself?

A. No.

Q. **But your allegation is that the fall was caused by a slippery condition that was caused by leaves on the ramp, correct?**

A. **That is correct.**

*Id.* at 21-23 (emphasis added). When shown photos of the ramp taken by

her friend on the day after the incident, Mohar testified as follows:

Q. [] . . . Looking at the top picture, does this seem to depict the way the area of the ramp looked on the day of your fall?

A. That was taken, like I said, the day after the fall. . . . And because I fell, it would probably look different, too. I wonder—I'm guestimating [sic] here. There's a line in the middle and I wonder if that was from my other foot when I fell.

*Id.* at 55. When asked to specifically identify the cause of her fall, Mohar

testified as follows:

Q. . . . You have alleged that you fell as a result of a dangerous and slippery condition. . . . I heard you talk about leaves. I

heard you talk about some brownish stuff and some greenish stuff under the leaves, and I also heard you talk about damp wood. **What actually caused you to fall or don't you know?**

A. **I don't know.  I was standing up.  I turned around.  I was no longer standing up.**

Q. OK.  . . .  So[,] **as you sit here today, you're not sure if it was leaves that made you fall, damp wood that made you fall, the green stuff that made you fall, the brown stuff that made you fall, or some combination of all or some of those**?

A. **Correct.**

Q. **Is it possible that you didn't slip?**  Is it possible that, given the way you turned, could have sort of caused you to lose your balance?

A. **I won't say that's impossible**, but I don't normally go around falling down.

Q. [K]nowing that you were standing and then you weren't, **you can't say for sure as you sit here; is that right?**

A. **Correct.  I know I was turning to go back down the ramp.**

Q. **But you're not sure what happened after that?**

A. **Right.**

Q. You were in the bush?

A. Yes.

*Id.* at 59-61 (emphasis added).  Mohar testified later, along the same lines, as follows:

Q. I think you testified that you took two or maybe three steps up the ramp in order to check the door?

A. Yes.

Q. In those two or three steps, you didn't slip or fall correct?

A. Correct.

Q. Did you take another step when you started to turn?

- 11 -

A. Yes. I would—just how my body moves, I would think I would have been starting to turn with my right foot because I was turning that direction.

Q. Do you recall putting that right foot down on the ramp?

A. I don't remember doing that.

Q. Did you feel your foot slip that day?

A. I don't know that I felt it slip, but it had to have happened the way I fell.

Q. Did you lose your balance that day?

A. No.

Q. Did you examine the surface of the wooden ramp to the shed after you fell?

A. Not that day, no.

*Id.* at 91-92.

Wood also gave deposition testimony about the day of the incident and testified regarding the ramp and Mohar's fall as follows:

Q. The photograph that was shown of the ramp, although you hadn't seen it before the incident itself, does that depict the condition of the ramp to the extent, if any, that you could observe immediately after the fall occurred?

A. When [Mohar] had fallen, she was sitting on the ramp. She was sitting on the ramp, so I did not observe the condition of the ramp.

Q. Did [] Ms. Mohar describe how she fell or what she thought caused her fall?

A. She said that she slipped.

Q. **Did she say what she slipped on?**

A. **No.**

Deposition of Denise Wood, 3/30/22, at 33 (emphasis added). In the same deposition, Wood later testified as follows:

- 12 -

Q. [] [Y]ou said earlier that [Mohar] told you that she had slipped on the ramp; is that correct?

A. She didn't say anything about the ramp. She was on the ramp, so she said she had slipped.

Q. **And did she say at all what caused her to slip?**

A. **No.**

*Id.* at 38 (emphasis added).

Although not a witness to the incident, Smith was also deposed relating to her knowledge of the incident and observations of the ramp on the day the incident occurred, and testified as follows:

Q. Okay. And so[,] when you and your clients got out to the shed, did you take particular notice of the ramp because you had already been told that the ramp was involved in some sort of accident?

A. Correct. So, yes, we were, like, oh, this—we need to be careful.

. . .

Q. So looking at the first picture, looking how the ramp looks in that photograph, does that appear to be how the ramp looked when you observed it on the day of this incident?

A. Well, I d[on]'t recall what the weather was that day. [] However, when we knew that someone had fell that day on it, when we looked, what I recall is it did look—it did look—what's the word I'm looking for—sketchy is all I can think of, off the top of my head. But it did appear dangerous. I don't recall if it looked like this picture, though.

Q. Okay. So[,] what was it, specifically, about the appearance of the ramp on the day of the incident that led you to conclude that it was dangerous?

A. What—I hate to answer fully because I don't 100% recall, but in my gut . . . I do remember thinking about algae. And what I mean by that is, from experience, when a deck—and I'll use a deck—this is not a deck; this is a ramp. But on a deck[,] when algae is on a deck and the deck is greenish looking, it can be

slippery. So[,] I do remember thinking it was potentially algae on that ramp.

Q. Do you have a specific recollection as to whether there were any leaves on the ramp when you saw it that day?

A. I don't recall.

Q. And so you mentioned you thought there could be some algae. So[,] would it be fair to say that you recall that the ramp may have had a greenish color to it on the day of the incident?

A. It's possible.

Q. Do you recall any other dirt that was on the ramp that day of a darker color, such as the darker color shown in exhibit B?

A. I don't recall.

Deposition of Nyssa Smith, 3/30/22, at 11-13. When asked about her observations of the ramp after the incident and if she noticed any evidence that indicated that a slip had occurred, such as a scuff or skid mark, Smith testified that she didn't notice anything of that kind. *Id.* at 19.

Later in the same deposition, when asked follow-up questions about her observations and the potential existence of algae on the ramp, Smith testified as follows:

Q. You said that you thought that there was some possible algae on this ramp. What made you believe that it was possibly algae?

A. When I understood that the fall had occurred at the shed, I— when I looked it just—I remember it looking—I don't know why I can't think of another word than "sketchy" but it did look sketchy.

. . .

Q. Did the ramp look wet?

A. I don't recall the weather conditions, whether it was ice, rain, leaves. I don't recall the condition, like what type of—but I do remember seeing the green.

- 14 -

Q. And where did you see the green? Was it just in spots or was it, like, kind of all[-]encompassing over the ramp?

A. I don't remember.

. . .

Q. Does the fact that you were told that there had been an accident at this shed at all affect how you looked at that ramp with your clients?

A. Yes.

*Id.* at 20, 24.

In support of its order granting summary judgment, the trial court cited ***Houston***, ***supra***, ***Freund***, ***supra***, and ***Erb v. Council Rock Sch. Dist.***, 2009 Pa. Cmwlth. Unpub. LEXIS 612 (Pa. Cmwlth. 2009).[2]

In ***Houston***, our Supreme Court found that entry of a compulsory nonsuit in a negligence action was proper because the plaintiff failed to establish the defendant's negligence as the cause of the injury. In that case, the wife of the deceased posited that her husband's death was caused when he caught his foot on a splinter or sliver of wood, three to five inches long, on the edge of the third step from the top of the stairway as he descended, resulting in him falling down the stairs to his death. ***Houston***, 22 A.2d at 716. The ***Houston*** Court explained its decision—that the plaintiff failed to establish the element of causation sufficient to submit the issue to a jury—as follows:

---

[2] ***See*** Pa.R.A.P. 126(b)(1)-(2) ("non-precedential decision," that refers to unreported memorandum opinion of Commonwealth Court filed after January 15, 2008, may be cited for persuasive value).

- 15 -

> While it may be that appellant's hypothesis as to the cause of this regrettable accident is a plausible one, for all that appears from the evidence, **the circumstances relied upon are at least equally consistent with theories of the case attributing the accident to a variety of causes, not excluded by the evidence, for none of which any of appellees could conceivably be held liable** . . . **including the possibility that the deceased may simply have tripped or stumbled, without such tripping or stumbling having any connection whatever with the defects in the steps complained of.** Under these circumstances, a finding that the fatal injuries of appellant's husband resulted from the negligence alleged would, at most, represent nothing but a mere guess or conjecture; hence, a verdict for appellant could not be sustained.

*Id.* (emphasis added). In essence, the **Houston** Court determined that because the evidence supported additional potential causes for the decedent's injuries as those posited in plaintiff's theory, and some of those other causes would not result in the defendants' liability, the jury was not permitted to guess amongst the possible causes of the decedent's injury.

Similarly, in **Freund**, the Pennsylvania Supreme Court affirmed the trial court's entry of a compulsory nonsuit where witness testimony did not identify the cause of the plaintiff's fall. **See Freund**, 103 A.2d at 659. In that case, the plaintiff testified that she fell on a "step" near a tree on the sidewalk. **Id.** There also was a photograph in the record that showed that there was a block of pavement near the tree which was slightly elevated as compared with the adjoining block, and that there were also two steps very nearby. **Id.** The Supreme Court concluded that the plaintiff failed to prove causation because there was no evidence that she fell over the elevated step, or that she actually fell at that spot, or that that elevation was the cause of her fall. **Id.** at 659-

60. It was equally plausible that she may have turned her ankle or fallen or stumbled for some unknown reason at or near this elevation. **Id.**

Finally, in **Erb**, **supra**, the Commonwealth Court granted summary judgment in favor of the defendant after determining that the plaintiff failed to meet her *prima facie* burden where she did not produce any evidence that a defective condition was the proximate cause of her fall and injury. **See Erb**, **supra**, at *1. In that case, the plaintiff fell on a ramp but was not able to testify to her slipping or tripping and did not know what caused her fall. **Id.** at *3-*4. The "crucial factor" for the Court in finding the plaintiff failed to establish causation was that the plaintiff could not explain how any condition of the ramp caused her to fall. **Id.** at *9-*10.

Here, Mohar argues that each of these decisions—**Houston**, **Freund**, and **Erb**—is distinguishable from the instant matter. First, Mohar argues **Houston** is distinguishable because, contrary to the lack of witness testimony regarding the injury at issue in **Houston**, here, Smith, an independent witness, testified that she observed the ramp on the day of the incident and concluded that the ramp was "sketchy," "precarious," and "dangerous," and she thought there was potentially slippery algae on the ramp. **See** Appellant's Brief, at 11.

Mohar further argues **Freund** is factually distinguishable because, contrary to the plaintiff in that case, Mohar knows she fell on the ramp and testified that she could observe the area where she slid in the photograph taken the day after the incident. Specifically, Mohar argues that she was able

to establish her *prima facie* case on the element of causation because she testified as follows:

> When I went back later to look at that to see what did make me fall, there were some brown and green colored items. **I could see where I slid in the pictures that I took on the ramp** and you could see—it's like a mossy type thing underneath the leaves, what I would assume would grow on wood.

Appellant's Brief, at 12-13 (emphasis in original).

Mohar also argues that **Erb** is distinguishable because, here, Mohar's testimony was misinterpreted by the trial court to mean that she did not know why she fell to the ground. **See** Appellant's Brief, at 15. Instead, Mohar claims that the trial court should have understood that the totality of Mohar's testimony showed that she was unable to narrow the possible options down to one single actual cause of her fall, but she had already testified that the photos showed where she slid on the ramp. **Id.**

Viewing the evidence in a light most favorable to Mohar as the non-moving party, we conclude the evidence of causation is completely circumstantial, and, at best, Mohar's evidence shows only that the ramp had brown and green items and damp leaves on it and that Mohar fell while turning on the ramp. There is no evidence that any of the alleged potential defects actually caused Mohar to fall. Indeed, viewing the totality of Mohar's testimony, Mohar could not identify the cause of her fall and admitted, quite candidly, that she did not recall slipping or losing her balance, or the position of her ankle at that time. **See** Deposition of Lauren Mohar, 11/23/21, at 21-23, 59-61, 91-92.

As in **Houston**, **supra**, the evidence in this matter, when viewed in the light most favorable to Mohar, as the non-moving party, includes the equal possibility that Mohar's alleged injuries resulted from a trip or stumble, without such tripping or stumbling having any connection with the ramp's alleged defects. Indeed, Mohar herself could not rule out the possibility that she simply fell without any connection to Appellees' alleged negligence. **See** Deposition of Lauren Mohar, 11/23/21, at 59-61. Further, Smith's deposition testimony, when viewed most favorably to Mohar, is wholly insufficient because Smith only testified that there was **potentially** algae on the ramp and that the ramp was **possibly** green, and it appeared sketchy and dangerous. Simply put, Smith could not specify why or how Mohar fell, and Smith agreed that prior knowledge of Mohar's fall influenced how she viewed the ramp that day. **See Du Bois v. Wilkes-Barre**, 189 A.2d 166, 167 (Pa. 1963) (Where melted ice cream and grease on sidewalk may have caused plaintiff's injuries, "[t]he plaintiff's testimony failed to establish what caused her to fall. . . . [I]t is necessary for the plaintiff to prove what **actually** caused the accident, not what **might** possibly have caused it. The jury cannot be allowed to guess that the fall resulted from the existence of a foreign substance on the sidewalk.") (emphasis in original).

Moreover, contrary to Mohar's claims, we agree with the trial court and find **Freund** to be applicable to the facts of the instant case. Indeed, there is no evidence in the record as to what caused Mohar to fall or that a defect in the ramp was the cause of her fall. Even though she could testify as to where

she slid, Mohar failed to make the connection between slipping and the Appellees' alleged negligence. A jury is not permitted to reach a verdict on such speculation or conjecture as to the cause of Mohar's fall. *See Freund*, *supra*; *see also Harrison*, 44 A.2d at 274 (Plaintiff failed to establish causation when she testified that: where she slipped was "slick," "I know I slipped off something higher than what the sidewalk was," and "I didn't know what I had slipped on[.]"); *see also Hulings v. Pittsburgh,* 28 A.2d 359, 360-61 (Pa. 1942) (Causation not established where plaintiff testified she fell on ice but not that ridge of ice caused fall rather than smooth surface ice, testifying as follows: Q. "And what caused you to fall?" A. "Well, my feet slipped on the ice. . . I just fell right straight down on my back [and] after I fell I was reaching around [] and I could feel large ridges and ruts."); *see also Davis v. Potter*, 17 A.2d 338, 338-39 (Pa. 1941) (Causation not established and "far from clear" where witness testified that while walking on snow and ice: "'My foot went down an incline, and I fell. . . . Asked, 'Are you sure you didn't fall or stumble over anything?' she answered, 'No.' She testified: 'My foot . . . just went off like a slant.'"); *see also Jones v. Plumer*, 226 A.3d 1037, 1044 (Pa. Super. 2020) (Affirming entry of summary judgment for defendant because plaintiff failed to establish *prima facie* causation where plaintiff could not testify as to defendant's negligence that caused her injury); *cf. Marks v. Tasman*, 589 A.2d 205 (Pa. 1991) (*Prima facie* causation established where 89-year old legally blind man tripped and fell on a sidewalk and friend who accompanied him did not see plaintiff fall but

did see a depression in the sidewalk near the plaintiff's feet immediately after falling); ***see also Martin v. Pittsburgh***, 175 A.2d 900, 902 (Pa. 1961) (Causation established where plaintiff testified that she fell when her foot went into hole with snow and ice, and independent witness testified that plaintiff's foot was in hole when he picked her up after fall); ***see also Kardibin v. Associated Hardware***, 426 A.2d 649, 653 (Pa. Super. 1981) (Eyewitness testimony directly linked fall to defective condition where plaintiff testified: "Q. After you got up, did you examine the roadway or the pavement to determine why you fell or what caused you to fall?  A. Yes, my foot was in it. And I could see it was like this, like sunken in."); ***see also Bowser v. Kuhn***, 49 A.2d 852, 854 (Pa. Super. 1946) (Plaintiff established causation when she positively testified as to the cause of her injuries:  "When I stepped into the ridges I heard my ankle pop and down I went."); ***see also Hyatt v. County of Allegheny***, 547 A.2d 1304 (Pa. Cmwlth. 1988) (*Prima facie* causation established where airline employee presented evidence that, upon falling, she observed upturned edge of floor mat, which caused her to fall, and defendants controlled mats and had adopted policy of taping all four edges to avoid falls).

Consequently, because Mohar failed to adduce evidence to prove a causal connection between her injuries and Appellees' alleged negligence, we affirm the order granting summary judgment.

As to her second issue raised on appeal, Mohar argues that the trial court erred as a matter of law when it failed to view the evidence in the light most favorable to Mohar, as the non-moving party, because the court ignored

that Mohar testified that, "I could see where I slid in the pictures that I took on the ramp[.]" Appellant's Brief, at 17.

We conclude this issue is meritless as well, because, when considering Mohar's testimony as a whole, at best, it demonstrated only that there were damp leaves and some green and brown items on the ramp and that Mohar fell while turning on the ramp, but not the crucial factor of **which, if any**, of the potential alleged defects **caused** Mohar to slip.[3]  There was no evidence in the record on the issue of causation for the trial court to view in a light most favorable to Mohar—and Mohar's mere testimony that she slipped does not establish causation.

As reproduced more extensively, *supra*, Mohar's testimony—when viewed in the light most favorable to her and taken as a whole—was far from clear on whether she slipped and how or why she fell.  At her deposition, when questioned if it was possible that Mohar did not slip, Mohar testified, "I won't

_____

[3] Mohar testified that she clearly observed the damp leaves on the ramp prior to her fall and that those leaves did not concern her.  Although Mohar's complaint alleges that the leaves created the slippery condition, she did not establish through evidence that the leaves caused her to fall, and the leaves cannot be the cause of her alleged harm.  ***See Smith v. Sheraden Bank***, 116 A.2d 346, 348 (Pa. Super. 1955) ("In what may be termed the obscuration cases, *i.e.*, where the dangerous condition is hidden by some substance such as water, snow, paper[,] or confusing lights, the obscuration is never the legal cause of the harm, but operates in certain cases to relieve the injured party from the contributory negligence of failing to observe the danger.").  Here, Mohar also failed to establish the presence of the brown and green items that allegedly existed under the damp leaves as the cause of her fall and the jury was not permitted to guess these to be the cause of her injury.

say that's impossible, but I don't normally go around falling down." Deposition of Lauren Mohar, 11/23/21, at 59-61. Most telling, when asked, "[K]nowing that you were standing and then you weren't, you can't say for sure as you sit here; is that right?," Mohar answered, "Correct. I know I was turning to go back down the ramp," and Mohar agreed that she was not sure what happened after that. *Id.*

Also, based on our review of the record, we find that Mohar did not adduce evidence of actual or constructive notice of an unsafe condition sufficient to submit the question of negligence to a fact finder. *See Loeb*, 147 A.2d at 338; *see also Hess v. Sun Ray Drug Co.*, 127 A.2d 699, 701 (Pa. 1956), citing *Lanni v. Penn. R.R.*, 88 A.2d 887 (Pa. 1952) (notice of unsafe condition not established where plaintiff slipped on spilled orange juice, but adduced no evidence as to how long juice remained on floor prior to accident). Indeed, here, the evidence of record is wholly insufficient to submit to a jury to establish actual or constructive notice because the only evidence of notice to the defendants of a potentially unsafe condition is Mohar's vague testimony about brown and green items that she **assumes** grow on wood that she saw in photos, taken the day after the incident, of the ramp, *see* Deposition of Lauren Mohar, 11/23/21, at 13-14, as well as Mohar's testimony that **it rained at some unspecified point in the night or morning previous to her fall**:

> Q. [] It's my understanding that it was not raining at the time of this incident, but it had rained earlier in the morning, correct?

A. **I don't know if it rained in the morning or the night before. It had rained at some point.**

Q. [] I know you had to walk through a bit of grass to get from the house to the shed, correct?

A. Yes.

Q. [] As you were walking through this backyard area, was it still damp? Was it a little bit wet still?

A. I don't recall my feet being wet.

Q. Do you recall it seeming a little damp still, the grass, even if your feet weren't getting wet?

A. **I feel like it was still damp that day** even though the sun had come out in the afternoon.

Deposition of Lauren Mohar, 11/23/21, at 58-59 (emphasis added); *id.* at 11 ("Q. Was it sunny? A. The sun was out at that time, but it had rained previously."). Also, we find that Mohar's testimony as to **her assumptions** regarding the green and brown colored items she saw in photos taken the day after her fall, as well as **her feeling** there was still dampness that day, **and not her recollections** (in either instance), amounts to speculation and conjecture that is insufficient to submit to a jury. Moreover, Smith's deposition testimony also did not establish actual or constructive notice to the defendants of any unsafe condition:

Q. Did the ramp look wet?

A. **I don't recall the weather conditions**, whether it was ice, rain, leaves. I don't recall the condition, like what type of—but I do remember seeing the green.

Q. And where did you see this green? Was it just in spots or was it, like, kind of all[-]encompassing over the ramp?

A. **I don't remember.**

- 24 -

Deposition of Nyssa Smith, 3/30/22, at 20 (emphasis added).

In light of the foregoing, we conclude that the trial court properly determined that Mohar failed to meet her *prima facie* burden to establish the element of causation for her negligence claim, and we further find that Mohar failed to establish necessary evidence of actual or constructive notice to the defendants of any unsafe condition.

Judgment affirmed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 3/21/2024